Matter of Doyle ZZ. v Muriel YY. (2026 NY Slip Op 50356(U))

[*1]

Matter of Doyle ZZ. v Muriel YY.

2026 NY Slip Op 50356(U) [88 Misc 3d 1236(A)]

Decided on March 18, 2026

Family Court, Tompkins County

Miller, J.

Published by New York State Law Reporting Bureau
pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be
published in the printed Official Reports.

Decided on March 18, 2026
Family Court, Tompkins County

In the Matter of a
Custody Proceeding 
 Under Article 6 of the Family Court Act Doyle ZZ., Petitioner,

againstMuriel YY., Respondent.

Docket No. XXXX

Petitioner father was represented by Attorney Stephen Davey, Esq.Respondent mother was represented by Attorney Todd Livingston, Esq.Citizens
Concerned for Children, Inc. (Attorney Elizabeth McGrath, Esq.) represented the child.

Scott A. Miller, J.

Petitioner Doyle ZZ. (hereinafter "the father") and Respondent Muriel YY. (hereinafter "the
mother") are the parents of the subject child (date of birth: XX/XX/21) (hereinafter "the child").
This is a proceeding pursuant to Family Court Act Article 6. This action commenced with the
mother's filing of a violation petition on April 2, 2025.
A Modified Fact-Finding Hearing was conducted by the Court on January 8, 2026. The
mother was represented by Attorney Todd Livingston, Esq., the father was represented by
Attorney Stephen Davey, Esq., and the child was represented by Attorney Elizabeth McGrath,
Esq., of Citizens Concerned for Children, Inc. The Court heard testimony from the parties and
[*2]received exhibits into evidence. Certified medical records of
the mother's hospital admission in April 2023 were subpoenaed by the Court, received into
evidence as Court Exhibit 1, and provided to counsel with a release order prohibiting
redistribution. The Court has reviewed the final summations filed by counsel.
The Court searched the statewide registry of orders of protection, the Sex Offender Registry,
and the Family Court's child protective records, and notified the parties and the attorneys of the
results of these searches.
 PROCEDURAL HISTORYOn March 7, 2025, a Final Order was entered
following a Modified Fact-Finding Hearing held on March 3, 2025. Pursuant to the order, the
father was granted sole legal custody and primary placement of the child. The mother was
granted parenting time from Thursday at 5:30 p.m. until Sunday at 5:30 p.m. during Week A, and
on Wednesday from 5:30 p.m. to 7:30 p.m. during Week B. The mother was granted additional
parenting time as the parties agree, in addition to full and open equal access to all medical,
educational, and extracurricular records for the child, including the right to attend meetings,
appointments, and parent-teacher conferences. The five-page Final Order also set forth a holiday
schedule as well as many other detailed provisions including that neither party shall engage in
harassing behavior towards one another, that the parties' communication shall be limited to
matters concerning the child, and that the mother shall not cut the child's hair or allow anyone
else to cut the child's hair without the written consent of the father.
On April 2, 2025, four weeks after entry of the Final Order, the mother filed a violation
petition. On June 20, 2025, the father filed a modification petition by order to show cause. On
December 16, 2025, the father filed an order to show cause seeking suspension of the mother's
parenting time; the Court granted the father's requested temporary relief and suspended the
mother's visits pending the Modified Fact-Finding Hearing. At the Modified Fact-Finding
Hearing on January 8, 2026, the mother withdrew her violation petition leaving only the father's
petitions pending.

FINDINGS OF FACT
These parties have been litigating before this Court since July of 2021 when the child was
just six months old. Over the years, the father has matured, achieving stability in all areas of his
life including marriage, housing, and employment. The Court appreciates the significant progress
he has made over the years, embracing the responsibilities of parenthood and growing into the
father his son needs. The father is a fit and loving parent. The Court found the father to be
completely credible.
Unfortunately, the mother's condition has deteriorated markedly over the same period. She
has gone from being the child's primary caregiver to having her parenting time significantly
reduced to recently having her parenting time suspended by the Court due to concerns over the
child's safety in her care. She has stopped taking her prescribed medications in favor of a
"holistic" approach, and her mental state is decompensating. She suffers paranoid delusions
which are now impacting the child who is expressing irrational fears of being kidnapped. The
mother is also harassing the father, and she willfully cut the child's hair—for the second
time—in violation of the Final Order. The Court did not find the mother to be
credible.
On April 5, 2023, while the child was in the mother's care, police and EMS were dispatched
to the mother's apartment in response to the mother's own call to 911 in which she expressed that
her apartment was being haunted by "Ultra." Court Exhibit 1. The mother was [*3]admitted to the Behavioral Services Unit of Cayuga Medical Center
where she remained until her discharge on April 21, 2023. Court Exhibit 1. During her
admission, she disclosed a history of depression and anxiety with one prior hospitalization. She
was diagnosed with unspecified psychotic disorder and marijuana use disorder. Court Exhibit 1,
Discharge Summary. The hospital noted:
"The police brought [the mother] to the CMC Emergency for significant paranoia
and delusion in the community. On her first day of admission, [the mother] was grossly
psychotic, disorganized, internally preoccupied, and unable to converse coherently. She was very
hostile with intense eye gaze and refused medication but was behaviorally controlled. She
received a one-time p.r.n. IM medication and was placed in restraint due to her grossly
significant disorganized behavior. She had delusions that her baby's father died in the hospital,
and the staff poisoned her and her apartment building was doing witchcraft. We submitted for the
treatment override, which was approved. Thereafter she started taking her medication,
risperidone 1 mg in the morning and 2 mg at bedtime. She started responding to her medication.
We have seen significant improvement in her; however, we continue to see residual mood
symptoms and a delusional thought process. She continued to believe that she was in the hospital
because of witchcraft in her building, and the staff and her neighbor wanted to get her in trouble.
She continued to show limited insight into the circumstances that brought her to the hospital and
medication. Given that, we talked to her about a long-acting injection initially, she was very
reluctant to take the long-acting injection, but she understood and agreed with a long-acting
injection." Court Exhibit 1, Discharge Summary.The hospital discharged
the mother upon her assurances that she would comply with her outpatient appointments and
medication regimen, which included Invega Sustenna, a monthly injection for adults with
schizophrenia, and Hydroxyzine for anxiety. Court Exhibit 1, Discharge Summary. However, the
mother testified at trial that, at some point in the year after her discharge, she had stopped taking
her prescribed Invega and Risperidone because they were "very strong," she "felt like a zombie"
on them, and they "hurt [her] heart." When asked whether she discussed these side effects with
her doctor or inquired whether she could try a different medication, she testified, "No, they said
you can take it or not. Take it if you want to or not." The mother also insisted, "What they were
trying to diagnose me with wasn't accurate. I'm better now than I was." The mother is not in
counseling and denied needing a counselor, stating, "I don't need a counselor to tell me if I'm ok."
She testified she would not be willing to see a counselor even if the Court asked her to start
working with one. Instead, the mother declared that she relies on her faith and follows a
"holistic" approach to her health but failed to elaborate further.[FN1]
The Court did not find the mother to be a credible reporter of her medical and mental health
needs. It is clear that her mental health is declining now that she is no longer taking her [*4]prescribed medications.
The Court shares the father's concern that the mother cannot safely and properly supervise
the child in her current state and that the mother's paranoid statements to the child are harming
him. The father testified credibly that when the four-year-old child comes home from visits with
the mother, he talks about people trying to kidnap him and take pictures of him. The child is
starting to believe the things the mother is telling him such as that people are following them on
the bus, following them home, breaking into the mother's home, coming into the mother's home
at night, and stalking them. One day, the mother even texted the father that she believed a man
and woman were stalking her and the child, and she sent the father a picture of a red car across
the street. (Exhibits E-1 and E-2). The father testified that the mother believes in paranormal
activity, and on one occasion the mother texted the father repeatedly that "stuff was breaking" in
her home including her television. (Exhibit C-1).
The mother has also harassed the father in violation of the Final Order. She texts him
frequently about matters not having to do with the child. In August of 2025, the mother called
CPS falsely claiming that the father was sexually abusing his 4-day-old child. She then texted the
father, "I think CPS will totally understand too since I contacted them let them know how your
true behavior is." (Exhibit F-1). The report was deemed unfounded. On another occasion, the
mother texted the father claiming the child was doing something sexual with his bath toy: "He
was trying to do something inappropriate with his bath toy and he knew it was bad he didn't do it
again after I question [sic] him and he's trying to tell me he didn't learn it from anyone but yet he
must have to copy the bad behavior." (Exhibits B-1 and B-2). At one point, the father texted the
mother, "Stop texting me unless it is pick up or drop off logistics. If this continues im [sic] taking
you to court for harrasment [sic]." (Exhibits C-1 and C2). In response, the mother sent the father
a middle finger emoji followed by the texts, "Stop being mean/ You are a demon after doing
fruity stuff/ I hope you get baptized like a cat." (Exhibit C-2). 
It is important to the father, the father's family, and the father's culture that the child's hair is
grown long. The mother is aware of this. Every year around the holidays the father's family
comes to visit from New England. The mother is also aware of this. Just before the visit in
December of 2024, the mother cut the child's hair without the knowledge or consent of the father.
Because this issue was addressed at the previous Modified Fact-Finding, the Court made it part
of the Final Order that "the mother shall not cut the subject child's hair or allow anyone else to do
so without the written consent of the father." Final Order entered March 7, 2025. However, just
before the visit in December of 2025, the mother yet again cut the child's hair without the
knowledge or consent of the father—this time in violation of this Court's order. (Exhibits
A-1, A-2, and A-3). She then texted the father cryptically, "The knots are gone." (Exhibit B-1).
She was fully aware of this Court's Final Order. She testified that she cut the child's hair because
it was knotted up and painful. The Court did not find this testimony to be credible. Had this been
true, the mother should have advised the father of the problem. The mother cut the child's hair to
spite the father, in willful violation of this Court's Final Order.
The mother is unemployed and receives Section 8 housing. She relies on the food pantry and
her boyfriend for financial assistance. The mother testified that she is estranged from her family
and does not trust them. She could not name any social supports besides her boyfriend, who, it
was revealed at the prior Modified Fact-Finding Hearing, sells marijuana for a living. As a result
of the prior hearing, the Court ordered that the child was not to go to the mother's boyfriend's
place of business.
Unfortunately, the mother has damaged her relationship with the child's school through her
own anti-social behavior. For example, when the child's teacher took several days to respond to
one of the mother's emails, the mother wrote, "Thank you for excluding me out of my son's life."
The school will no longer communicate with the mother via email due to several emails the
mother sent the teacher which were deemed inappropriate by both the teacher and the principal.
The mother is unable to maintain relationships that will benefit her child.

CONCLUSIONS OF LAW
A "party seeking to modify an existing custodial arrangement" must "demonstrate, as a
threshold, that 'there has been a change in circumstances since the prior custody order significant
enough to warrant a review of the issue of custody to ensure the continued best interests of the
children' (Matter of Tyrel v. Tyrel,
132 AD3d 1026, 1026 [2015] [internal quotation marks and citations omitted]; see Matter of Gerber v. Gerber, 133
AD3d 1133, 1135 [2015])." Matter
of Harrell v. Fox, 137 AD3d 1352, 1354 (3rd Dept. 2016). If the requisite change of
circumstances burden has been met, the petitioner must then demonstrate that the "best interests
of the child[ren] would be served by modification of that order (Matter of David ZZ. v. Suzanne A.,
152 AD3d 880, 881, 58 N.Y.S.3d 711 [2017] [internal quotation marks and citations
omitted]; accord Matter of Heather U. v.
Janice V., 160 AD3d 1149, 1150, 74 N.Y.S.3d 410 [2018] )." Beers v. Beers, 163 AD3d 1197,
1198 (3rd Dept. 2018).
The Court finds that, based upon all the facts and circumstances set forth above, the father
met his burden of demonstrating a significant change in circumstances since entry of the Final
Order on March 7, 2025. The mother has stopped taking her prescribed medications to treat her
diagnosed psychosis, and the paranoid delusions which prompted her April 2023 hospital stay
have returned. The mother's paranoid delusions of people stalking her and the child and
attempting to kidnap the child are harming the child who is now old enough to understand,
believe, and repeat them. The mother lacks insight into how her mental health is negatively
impacting the child. Furthermore, the mother has repeatedly violated the Final Order by harassing
the father and by cutting the child's hair for the second time without the father's knowledge and
consent. This is undoubtedly a significant change in circumstances warranting review of the
current order.
Turning next to whether it would be in the best interests of the child to modify the prior
order, "[a]ny court in considering questions of child custody must make every effort to determine
'what is for the best interest of the child, and what will best promote [his or her] welfare and
happiness' [internal citations omitted]." Eschbach v. Eschbach, 56 NY2d 167, 171 (NY
1982). "In determining the best interests of a child, a court must consider various factors,
including 'the parents' ability to provide a stable home environment for the child, the child's
wishes, the parents' past performance, relative fitness, ability to guide and provide for the child's
overall well-being, and the willingness of each parent to foster a relationship with the other
parent' [internal citations omitted]." Herrera v. Pena-Herrera, 146 AD3d 1034, 1035 (3rd Dept. 2017).
Further, "[t]he determination of whether visitation should be supervised is a matter left to Family
Court's sound discretion and it will not be disturbed as long as there is a sound and substantial
basis in the record to support it' (Matter
of Taylor v Fry, 47 AD3d 1130, 1131 [2008][internal quotation marks and citation
omitted])." In re Isaac Q, 53 AD3d 731 (3rd Dept. 2008). In David V. v. Roseline
W., the Third Department held that the family court appropriately continued the mother's
supervised parenting time finding that unsupervised parenting time would have been "detrimental
to the child's safety [internal citations omitted]" [*5]where the
mother "was unemployed, had no stable source of income and had unresolved mental health
issues, as evidenced by her continued outbursts in front of the child even after being released
from the hospital. There was also evidence calling into question her commitment to dealing with
her mental health issues and evidence of her recent prior drug use." David V. v. Roseline W., 217 AD3d
1112, 1114 (3rd Dept. 2023).
Here, the father is the only parent who is currently able to make sound decisions and provide
a safe and stable home environment for the child. The father has proven he is able to guide and
provide for the child's well-being, and the child has been thriving in his care. By contrast, the
mother is not presently a fit parent. Her paranoid delusions place the child's physical safety and
mental health at risk. The child is already expressing irrational fears of being kidnapped. The
Court has serious concerns about the safety of the child were he to be left in the mother's care for
any period of time without supervision by a third party. The Court finds that, presently, it would
be against the child's best interests to be in the care of his mother without supervision. As a
result, this Court is convinced by the overwhelming preponderance of the credible evidence that,
at this time, the best interests of the child necessitate that any parenting time with the mother be
supervised. As such it is hereby:
ORDERED, that the father shall have sole legal custody of the subject child; and it
is further
ORDERED, that father shall have primary placement of the child; and it is
furtherORDERED, that both parents shall have full and open access to all medical,
educational, and extracurricular records for the child, including the right to attend meetings and
appointments, speak with providers and teachers, and have separate parent-teacher conferences;
and it is further
ORDERED, that the mother shall be invited to all medical appointments and school
meetings that concern the child; and it is further
ORDERED, that the mother may attend all school activities to which parents are
invited and may contact the school for a list of such activities; and it is further
ORDERED, that the mother shall have supervised parenting time on Sundays from
1:00 p.m. to 4:00 p.m. to be supervised by a supervisor agreed upon by the parties; and it is
further
ORDERED, that the mother may have modified/additional supervised parenting
time as the parties may agree in writing (text message); and it is further
ORDERED, that the father will provide all transportation to and from visits; and it
is further
ORDERED, that both parents shall ensure that the subject child is driven in an
appropriate car seat by a licensed driver, and that there are no illegal drugs or marijuana in the
vehicle; and it is further
ORDERED, that neither party shall consume/use alcohol or marijuana or other
non-prescribed drugs while the subject child is in their care or for the eight hours prior to getting
the child for their parenting time. Both parties have an affirmative duty to ensure that no one else
consumes/uses alcohol nor marijuana in the presence of the subject child; and it is further
ORDERED, that the mother has an affirmative duty to ensure that the subject child
does not go to the mother's boyfriend's place of business; and it is further
ORDERED, that the father may cancel the mother's parenting time if the subject
child is ill, but that he must then provide the mother with makeup parenting time within 60 days
of the cancelation; and it is further
ORDERED, that the father may cancel the mother's parenting time if she is
inebriated by drug or alcohol use; and it is further
ORDERED, that the mother will confirm her parenting time with the child by text
prior to 8:00 p.m. on the day before the visit, and if the mother fails to confirm her parenting
time, the father may deny the visit for that day; and it is further
ORDERED, that neither party will engage in any harassing behavior toward the
other party; and it is further
ORDERED, that both parents shall communicate with one another via text and shall
restrict their communication to visitation logistics, medical emergencies, and information about
the subject child's appointments; and it is further
ORDERED, that the mother shall not cut the subject child's hair or allow anyone
else to do so without the written consent of the father; and it is further
ORDERED, that the parties must notify each other within 24 hours if there is any
change in residence; and it is further
ORDERED, that both parents shall make a reasonable effort to ensure that the child
does not refer to their spouse or significant other as "mother" or "father" but instead choose
another term of endearment for the child to use in addressing their respective spouse or
significant other; and it is further
ORDERED, that the father shall advise the mother of the subject child's upcoming
medical appointments within 24 hours of scheduling the appointment and must invite the mother
to attend the appointment; and it is further
ORDERED, that the mother may attend all medical appointments for the subject
child, and if she does opt to attend an appointment, the subject child's stepmother will not be
allowed to attend the appointment; and it is further
ORDERED, that in regulating their own behavior, the parties shall observe and
follow these "rights" of a child whose parents are separated (adapted from the Parent's Handbook
of the New York State Parent Education and Awareness Program — 2016):
1. The right not to be asked to "choose sides" between their parents.
2. The right not to be told any details of the legal proceedings going on between their
parents.
3. The right not to be told "bad things" about the other parent's personality or character.
4. The right to privacy when talking to the other parent on the telephone.
5. The right not to be interrogated by one parent about the other parent.
6. The right not to be asked to carry messages between parents.
7. The right not to be asked by one parent to tell the other parent untruths.
8. The right not to be used as a confidant regarding adult matters.
9. The right to express feelings, whatever those feelings may be.
10. The right to choose not to express certain feelings.
11. The right to be protected from parental "warfare."
12. The right not to be made to feel guilty for loving both parents; and it is further
ORDERED, that the parties have the affirmative duty to prevent anyone in the
child's presence from violating the rights of the child in the immediately preceding
paragraph.
Dated: March 18, 2026Hon. Scott MillerFamily Court Judge

Footnotes

Footnote 1:The mother testified in a similar
fashion at the prior Modified Fact-Finding Hearing on March 3, 2025, when she readily admitted
that she does not give the child medicine or use it herself. Instead, she "give[s] him holistic
approaches." As a result, the Court ordered that the father may cancel the mother's parenting time
when the child is sick so long as he provides her make-up time. Final Order entered March 7,
2025.